**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CASE NO. ______________**

ROBERT SCIRE and SHELLEY SCIRE,
Each Individually and as Next Friends to R.S.,

Plaintiffs,

v.

THE MICHAELS ORGANIZATION, LLC,
AMC East Communities, LLC, and MMS Air Force, LLC,

Defendants.
__________________________________________/

## COMPLAINT

Plaintiffs, Robert Scire, a Major in the United States Air Force stationed at MacDill Air Force Base in Tampa, Florida ("MacDill"), and his family suffered personal injuries because they lived in unsafe and unhealthy conditions while in privatized on-base military housing provided and managed by Defendants. Defendants' acts and omissions with respect to their operation, management, and maintenance of Plaintiffs' housing, as detailed in this Complaint, led directly to the unsafe and unhealthy conditions of their residence. Moreover, Defendants concealed these conditions from Plaintiffs through false and misleading statements and the failure to disclose known hazards. When these conditions were discovered, Defendants failed to properly repair and

remediate them. Plaintiffs bring this action to hold Defendants accountable for their acts and omissions.

## THE PARTIES

1. Plaintiffs ROBERT SCIRE and SHELLEY SCIRE resided at MacDill Air Force Base in Tampa, Florida, at all times relevant to this Complaint. ROBERT SCIRE and SHELLEY SCIRE are the parents of Plaintiff R.S. who also resided at MacDill at all relevant times.

2. Defendant THE MICHAELS ORGANIZATION, LLC ("Michaels" or "The Michaels Organization") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Michaels is registered to do business in Florida.

3. Defendant AMC EAST COMMUNITIES, LLC ("AMC") is a Delaware limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Upon information and belief, AMC is listed as the "Owner" on the lease signed by the Plaintiffs.

4. Defendant MMS AIR FORCE, LLC ("MMS") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. MMS is registered to do business in Florida. MMS has acted as property manager with respect to MacDill housing at all times relevant to this complaint.

5. Non-defendant HARBOR BAY AT MACDILL ("Harbor Bay") is the entity through which Defendants conducted many of the leasing, management, and maintenance activities relating to military housing at MacDill. Upon information and

belief, it presents itself as the landlord, appearing as the Landlord or Lessor on the Mold Addenda, even though Defendant AMC is the owner or the lessor on the leases. Upon information and belief, Harbor Bay is also listed as the Community Manager on Plaintiffs' lease and the lease addenda. Despite conducting extensive business operations in Florida, Harbor Bay is not a registered entity with the Florida Department of Corporations.

6. In related litigation, *Mullins et al. v. The Michaels Organization, LLC, et al.*, Case No. 8:25-cv-02637-SDM-AAS (M.D. Fla.), Defendant AMC represented that Harbor Bay is a "common or trade name" of Michaels and not a distinct legal entity. Plaintiffs allege the same upon information and belief. On information and belief, Defendants jointly manage, operate, and maintain MacDill military housing and are jointly responsible for the acts and omissions of Harbor Bay. Allegations concerning Harbor Bay therefore constitute allegations concerning Defendants.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The acts and omissions underlying Plaintiffs' claims occurred on a federal enclave, MacDill Air Force Base, over which the United States was ceded exclusive federal legislative jurisdiction in 1950. Plaintiffs are aware of no developments since 1950 that have had the effect of changing MacDill's status as an exclusive federal enclave. Because the acts and omissions giving rise to Plaintiffs' claims occurred on an exclusive federal enclave, Plaintiffs' claims are governed by federal law under the Federal Enclave Doctrine for purposes of subject-matter jurisdiction. *See Mater v. Holley*, 200 F.2d

123, 124 (5th Cir. 1952).

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Plaintiffs' claims occurred within this District on the federal enclave at MacDill where Plaintiffs were exposed to the conditions at issue.

9. This Court has personal jurisdiction over Defendants because their acts and omissions—carried out directly and/or through their agents and alter-egos—caused the harms complained of herein which occurred at MacDill. FLA. STAT. §§ 48.193(1)(a)(2), 48.193(1)(a). Defendants also derived substantial revenue, directly or indirectly, from services provided to persons in Florida.

## FACTUAL ALLEGATIONS

### The Military Housing Privatization Initiative

10. In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"). 141 Cong. Rec. S18853. The MHPI was intended to improve housing for service members and their families by allowing private housing companies to use their resources and expertise in improving existing military housing and new military housing.

11. Under the MHPI, a private contractor is granted a long-term lease of military base grounds. The private contractor is responsible for constructing new homes and renovating existing homes and then leasing, operating, managing, and maintaining the housing. The government also typically pays the contractor the full Basic Allowance for Housing ("BAH") to which the service member who rents the home is entitled. In addition, MHPI contractors typically receive performance incentive fees,

payable by the military department based on performance objectives, which include maintenance practices and resident satisfaction.

12. In response to concerns about dangerous, unsafe, and unhealthy conditions at MHPI housing, the 2020 National Defense Authorization Act created an MHPI Tenant Bill of Rights. The Tenant Bill of Rights specifies that military families have the right to reside in a housing unit that meets applicable health and environmental standards. They have the right to receive property management services that meet or exceed industry standards and that are performed by professional customer service and maintenance staff. 10 U.S.C. § 2890. Defendants purport to embrace the Tenant Bill of Rights and to incorporate its protections into their MHPI programs and activities.

13. Landlords are required to provide a housing unit that meets "minimum health, safety, and welfare standards set forth in Federal, State, and local law" and, if a walkthrough prior to move in indicates that those standards are not met, "remediate any issues and make any appropriate repairs[.]" 10 U.S.C. § 2891a(d)(4).

**MHPI Housing at MacDill**

14. In November 2007, AMC East, LLC and the United States Air Force entered into a 50-year lease to privatize military housing at MacDill AFB. In 2021, Michaels acquired the assets of AMC East, LLC and AMC. Michaels, either directly or through its subsidiaries or affiliates, assumed all obligations, as the MHPI contractor, including but not limited to obligations under the ground leases, operating agreements, property management agreements, and residential leases.

15. Plaintiffs paid their BAH to AMC. In addition, the Air Force pays Defendants for management and maintenance of the property. These payments consist of (1) a monthly base fee and (2) an incentive fee payment upon achieving certain performance criteria. To obtain the incentive fee, Defendants submit documentation and a statement that they satisfied performance criteria, including objectives related to maintenance work orders and customer satisfaction.

16. Language in the Operating Agreement indicated that the Agreement was intended to further the MHPI's goal of benefiting residents of MacDill military housing.

**Defendants' Joint and Integrated Approach to MacDill Housing**

17. Defendants are members of the Michaels conglomerate, at the top of which sits Michaels. Defendants function as an integrated enterprise in their operation of MacDill housing.

18. With respect to its activities at MacDill, on information and belief, Michaels operates independently and through entities, including Defendants AMC and MMS and non-defendant Harbor Bay.

19. The Michaels webpage showcases its involvement in military housing and points to MacDill as one location of its "[q]uality housing from Coast to Coast." Moreover, employees whose e-mail addresses and signature blocks suggest that they are employed by Michaels regularly work with residents at MacDill, including on leasing and maintenance issues.

20. Defendants were bound in agency and alter-ego relationships in leasing,

operating, managing, maintaining, and repairing the homes at MacDill.

**The Unsafe and Unhealthy Housing Conditions at MacDill**

21. Defendants have long known about mold problems at MacDill. Military families have for years submitted complaints about mold and health issues caused by exposure to mold. The standard lease contains warnings about moisture and mold. The Resident Guidelines and Community Handbook stress the need to immediately report signs of leaks, moisture, or mold.

22. For example, upon information and belief, Defendants were aware that numerous homes lacked vapor barriers between the first floor and outdoors or contained defective vapor barriers. This allowed unsafe amounts of moisture to enter the homes. Additionally, the air conditioning units in numerous homes lacked secondary drain lines, causing water to leak into homes.

23. Harbor Bay refused to follow its mold policies, despite knowing that failure to do so would lead to the growth of toxic mold.

**The Scire Family**

24. Major ("Maj.") Robert Scire, United States Air Force ("USAF"), his spouse, Shelley Scire, and their minor son, R.S., moved into 8538 Tampa Point Boulevard at MacDill on or about September 16, 2024. Maj. Scire's assignment to MacDill followed an approved humanitarian reassignment through the Air Force Surgeon General related to serious illnesses affecting members of his immediate family.

25. Maj. Scire entered into a lease with Defendants prior to moving into the residence. Upon information and belief, Plaintiffs' lease listed AMC as the Owner and

Michaels Management Services, Inc., or its successor, as the Property Manager. Upon information and belief, Plaintiffs' lease provided that Florida law applied.

26. Upon information and belief, Plaintiffs' lease represented that, prior to moving in, the home was in safe, clean, and habitable condition. Defendants either knew these representations were false or made them without any reasonable basis to know whether they were true, with the intent to induce the Scire family to accept the residence.

27. During their tenancy, Plaintiffs came into contact with, ingested, and inhaled mold, experienced elevated interior moisture and water intrusion, and suffered personal injuries due to the unsafe and unhealthy conditions described in this Complaint.

28. Less than one month after the Scire family moved into the residence, Hurricane Milton struck the Tampa area. When the family returned from evacuation on October 12, 2024, they reported damage to the roof, damage to the screened porch, and rainwater leaking through the ceilings, including water intrusion into the upstairs hallway ceiling. Harbor Bay placed a temporary cloth-like covering over the damaged roof on October 15, 2024. The roof was not fully re-shingled until January 22, 2025, more than three months after the family first reported the damage.

29. The roof was not the home's only water-related problem. In December 2024, every shower and bathtub in the residence stopped draining properly and the toilet would not flush. Sewage came up into the home from the drains. A Harbor Bay technician attempted to address the plumbing problems on December 4, 2024, but was

unable to correct them. Harbor Bay nevertheless marked the work order "completed." The identity of the Harbor Bay representative who falsely marked the work order as completed is known to Defendants and is within their possession, custody, or control.

30. At first, Harbor Bay resisted Maj. Scire's request that the family be removed from the home during plumbing repairs. He was eventually able to convince Harbor Bay that further repairs were necessary because none of the drains worked and sewage was entering the home. Harbor Bay moved the family out of the residence overnight while it conducted repairs.

31. On January 26, 2025, the Scires reported an active water leak and visible mold in a storage room. Harbor Bay repaired the active leak that day but did not address the mold or the affected drywall. The related work order was subsequently marked complete despite those conditions remaining unresolved. The family was forced to submit another service request on March 17, 2025, seeking installation of drywall or a new access panel around the exposed water meter and piping, which had been damaged by the leak. The water-damaged area was not remediated until approximately April 4, 2025—more than two months after it was initially reported. That work only included the application of Kilz and partial drywall replacement. This did not fully remediate the problems caused by the leak.

32. On February 19, 2025, the Scires reported another active leak in the master bathroom accompanied by a mold-like odor. The leak was not repaired until February 24, 2025.

33. Beginning on approximately April 7, 2025, third-party contractors

retained by Harbor Bay began work on areas of the residence damaged by water intrusion from Hurricane Milton. The work affected substantial portions of the family's living space, including R.S.'s bedroom, the downstairs hallway, living room, and bathroom. Rather than relocating the family during this work, Harbor Bay left the Scires inside the residence for approximately seven days while contractors cordoned off the work areas with loose plastic sheeting. The containment did not resemble a sealed isolation of the affected areas, leaving the family concerned that materials disturbed during the work were not adequately separated from their occupied living environment.

34. During this same period, the family's health began to deteriorate. Beginning in approximately January 2025, Maj. Scire's occasional episodes of bilateral numbness and tingling in his extremities dramatically increased in their frequency, severity, and persistence without explanation. He also experienced severe fatigue, anxiety, irritability, headaches, and other neurological complaints. He sought medical evaluation for the neurological symptoms on January 31, 2025, underwent cardiovascular evaluation for diminished pulses on February 21, 2025, returned for further neurological evaluation in March 2025, and underwent an echocardiogram in April 2025. Ms. Scire began experiencing significant memory impairment, persistent sinus congestion, headaches, respiratory irritation, and fatigue. R.S. developed rashes and respiratory and airway-related problems. He was evaluated for breathing concerns in February 2025. On April 3, 2025, he received a medical referral for hypertrophy of the tonsils and adenoids and allergic rhinitis. He underwent a sleep study on April 27, 2025. He

was evaluated by an ENT in May 2025, and he was referred for an adenoidectomy.

35. Maj. Scire's respiratory and systemic symptoms continued to progress. By May 20, 2025, his physicians documented persistent fatigue, loud snoring, witnessed apneic episodes, and breathing concerns, and referred him for pulmonary evaluation. He was evaluated by a pulmonologist in July 2025. On July 23, 2025, he sought urgent medical treatment for severe ear pain and a perforated eardrum. The following day, worsening facial and ear pain and fever required emergency-room treatment, where he was diagnosed with a severe middle-ear infection associated with fluid buildup from his sinuses. He was subsequently diagnosed with an outer-ear infection that persisted despite treatment.

36. On August 21, 2025, Maj. Scire was hospitalized with a fever reaching approximately 103 degrees, sepsis, and shortness of breath. He remained hospitalized for approximately six days. At discharge on August 26, 2025, he had been diagnosed with mastoiditis and autoimmune-related concerns, among other conditions. In light of his respiratory symptoms, recurrent infections, and unexplained medical problems, an infectious-disease physician encouraged the Scire family to have their residence evaluated for mold.

37. On August 28, 2025, Harbor Bay retained InDepth Environmental, Inc. ("IDE") to conduct a moisture assessment of the residence. IDE performed a visual inspection, moisture and relative-humidity measurements, temperature measurements, infrared imaging, and moisture-meter readings. IDE documented suspected mold growth on the mechanical-room ceiling near the HVAC supply plenum,

suspected growth within the air handler and supply plenum, and elevated temperatures in Bedroom #3. IDE did not identify the species of mold through laboratory sampling.

38. The Scire family was displaced from the residence on September 15, 2025. Approximately five days later, Maj. Scire learned from a neighbor that a prior occupant of 8538 Tampa Point Boulevard had also complained to Harbor Bay about mold or suspected mold within the residence. That information was not disclosed to the Scire family before they moved into the home. Had the family known that a prior occupant had complained of mold in the residence, they would not have signed the lease or moved into their MacDill home.

39. A post-remediation verification was performed on September 30, 2025. At the time of that inspection, however, the residence's HVAC system had reportedly been inoperable for more than a week, and interior temperatures had risen to approximately 96 degrees. Such a test normally includes mold testing, but Harbor Bay failed to conduct the appropriate tests. The residence nevertheless was marked as passing Harbor Bay's post-remediation process, and the family returned from displacement on October 15, 2025. The identity of the Harbor Bay representative who claimed that the home had passed this inspection is known to Defendants and is within their possession, custody, or control.

40. Within weeks, independent testing called that conclusion into serious question. On November 6, 2025, independent mold sampling documented extraordinary concentrations of fungal spores within the home's HVAC system. Samples from the HVAC supply plenum measured approximately 910,000 and 750,000

Penicillium/Aspergillus-type spores per cubic meter. The testing also identified Chaetomium and Penicillium/Aspergillus-type fungal contamination on subflooring surfaces. The family placed a work order, but, by this point, they had become worried that Harbor Bay might retaliate against them if they persisted beyond that.

41. The family's water-intrusion problems continued after the purported remediation. On December 8, 2025, Maj. Scire submitted another service request after the roof leaked into the master-bathroom ceiling. Despite the home's history of roof leakage, the documented fungal contamination, and the prior remediation, Maj. Scire was informed on January 29, 2026 that the affected ceiling would simply be painted over. The identity of the Harbor Bay representative who suggested this cosmetic repair is known to Defendants and is within their possession, custody, or control.

42. Maj. Scire continued pressing Harbor Bay to investigate the conditions documented by the independent testing. On February 2, 2026, he submitted a service request specifically seeking a post-remediation inspection based on the third-party mold findings. Harbor Bay maintenance personnel, including employees identified as Ivan and Julio, performed limited visual inspections of the residence but did not conduct invasive inspection of the ductwork, HVAC intake areas, or other concealed locations implicated by the independent findings. On February 23, 2026, Harbor Bay advised Maj. Scire that "no moisture was found" and represented that everything was clean. The full names of Ivan and Julio as well as the identity of the Harbor Bay representative who, upon information and belief, falsely informed Maj. Scire that no moisture was found, are known to Defendants and are within their possession,

custody, or control.

43. The family's experiences after February 2026 continued to contradict Harbor Bay's assurances. Maj. Scire continued to experience respiratory problems requiring an inhaler. In April 2026, the family traveled to Orlando for several days. During the trip, despite substantial physical activity, Maj. Scire required his inhaler only approximately once per day, compared with approximately two to three times per day while at home. Within approximately twenty-four hours of returning to the MacDill residence, his inhaler use returned to approximately two to three times per day.

44. The master-bathroom ceiling continued to experience water intrusion in 2026. In late July 2026, another active leak developed in the same general area that Harbor Bay had previously addressed. Harbor Bay maintenance placed clear plastic directly over the wet ceiling drywall while the underlying roof or vent leak remained unresolved. The plastic trapped moisture against the ceiling, and by early August 2026 Maj. Scire observed dark, circular, scattered growth developing beneath or around the affected area.

45. When Maj. Scire checked the associated work order, Harbor Bay's system showed that it was "on hold pending remediation." Yet when Harbor Bay technician Luis Figueroa arrived at the residence on August 7, 2026, he advised Maj. Scire that he had been told remediation was not necessary and that a contractor would instead perform the repair. Mr. Figueroa took a moisture reading that again confirmed excessive moisture and entered the attic, where he confirmed a visible leak associated with the bathroom exhaust vent extending through the roof.

46. On August 10, 2026, Harbor Bay acknowledged in writing that there had been miscommunication regarding the work orders and advised that a remediation supervisor would conduct a more thorough inspection while separate vendors addressed the leak and affected materials. Harbor Bay remediation supervisor Daniel subsequently inspected the residence and acknowledged that visible or suspected growth required remediation. He confirmed moisture and growth within the taped-off area and advised that the roof or vent source would first need to be repaired before the affected ceiling could be addressed. Harbor Bay reported the master-bathroom ceiling and roof or vent work complete by approximately August 19, 2026.

47. That purported repair again failed. On August 23, 2026—less than a week after the work was reported complete—the Scire family returned from a weekend trip and discovered a significant amount of water on the master-bathroom toilet and floor. Rainwater was visibly dripping through the bathroom ceiling exhaust fan. The leak stopped only after the rain outside subsided. Maj. Scire immediately reported the condition and submitted another work order. This represented at least the third reported episode of water intrusion involving the same master-bathroom ceiling area, despite Harbor Bay previously painting over water marks and, only days earlier, representing that repairs to the roof and bathroom ceiling had been completed.

48. On August 24, 2026, Harbor Bay technician David inspected the master-bathroom ceiling with a moisture meter. The meter detected moisture within the ceiling drywall near the exhaust fan, objectively confirming that water intrusion remained after the most recent repairs. Because of the recurring history, Maj. Scire separately

notified Harbor Bay's remediation manager and specifically requested that appropriate containment be arranged.

49. During their tenancy, Plaintiffs observed, came into contact with, ingested, and inhaled mold, experienced elevated interior moisture and water intrusion, and suffered personal injuries due to the unsafe and unhealthy conditions described in this Complaint.

50. These conditions occurred against a broader pattern in which the Scire family repeatedly reported leaks, moisture, suspected or visible microbial growth, plumbing failures, and building-envelope problems; work orders were closed or conditions represented as corrected; and the same or similar problems subsequently returned. Even after independent testing documented fungal contamination at elevated concentrations within the HVAC system, Harbor Bay's later visual inspection resulted in another representation that no moisture was present and that the residence was clean. Water intrusion nevertheless continued through at least August 2026.

51. Throughout their tenancy, Maj. Scire experienced progressive neurological, respiratory, sinus, infectious, and systemic problems, including numbness and tingling of his extremities, headaches, severe fatigue, anxiety, irritability, breathing difficulties, sleep-related breathing problems, vertigo, acute ear pain, recurrent infections, a perforated eardrum, mastoiditis, sepsis requiring hospitalization, and sinus abnormalities. CT imaging performed on October 21, 2025 revealed a right maxillary sinus retention cyst measuring approximately 2.2 centimeters. His ongoing symptoms required evaluation by multiple medical specialties, including neurology, cardiology,

pulmonology, infectious disease, and other providers. Maj. Scire's medical conditions have caused him to be referred into the Medical Evaluation Board process. This has altered his career timeline and accelerated his retirement trajectory. As a consequence, he has lost future active-duty earnings, suffered the lifelong reduction of his military pension, and has a reduced future earning capacity. Ms. Scire experienced significant memory impairment, chronic sinus congestion, headaches, respiratory irritation, fatigue, and related symptoms during the family's residency. R.S. experienced rashes, allergic and respiratory symptoms, sleep-disordered breathing, and airway problems. He required repeated medical evaluations, a sleep study, ENT treatments, and referral for adenoidectomy.

52. The Scire family came into contact with and inhaled or ingested mold and other hazardous substances and suffered physical injuries, emotional distress, financial losses, disruption and loss of use of their residence, and other damages as a direct result of Defendants' acts and omissions. Had the Scire family known the true nature and extent of the residence's history of water intrusion, prior mold complaints, HVAC contamination, recurring moisture conditions, and other hazardous conditions, they would not have moved into or remained in the residence. They continue to worry about the long-term effects of their exposure and, for Maj. Scire, the consequences to his health and military career.

53. Notwithstanding MacDill's status as a federal enclave, those of Plaintiffs' claims that seek recovery for personal injuries (including physical and emotional injuries) are governed, under 28 U.S.C. § 5001(b), by contemporary Florida law.

Contemporary Florida law also governs Plaintiffs' claims because all of those claims arise out of Plaintiffs' injuries suffered as a result of Defendants' acts and omissions in leasing, managing, and maintaining the home Plaintiffs leased from Defendants, and Plaintiffs' lease contains a choice of law provision selecting contemporary Florida law.

## CAUSES OF ACTION

### COUNT I: Breach of Contract (against Defendant AMC)

54. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

55. Plaintiffs had a valid lease with AMC. AMC owed contractual obligations to Plaintiffs to provide and maintain habitable housing and remedy leaks, moisture, mold, and other issues. Plaintiffs have complied with all obligations under the lease.

56. AMC failed to comply with the material terms of the lease by failing to ensure Plaintiffs' house was fit for human habitation and by failing to timely and adequately repair and remedy the conditions of the premises.

57. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered physical, psychological, emotional, and financial harm. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered substantial actual damages, including personal and property damages, financial damages, damages that require medical monitoring, and attorneys' fees and costs.

**COUNT II: Negligence**
**(against all Defendants)**

58. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

59. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home. Defendants negligently failed to meet the standard of care in performing those duties.

60. As the property owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain their home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

61. As property manager for Plaintiffs' MacDill home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

62. Defendants' acts and omissions in performance of their duties as Plaintiffs' lessors, landlords, and property managers fell far below the standard of care owed to Plaintiffs under Florida law.

63. Defendants' acts and omissions breached the duty of reasonable care

owed to Plaintiffs by failing to ensure that Plaintiffs' home was safe and fit for habitation.

64. Defendants breached the duty to exercise ordinary care in multiple respects, including: (a) failing to remediate defects they knew, or reasonably should have known, would cause moisture intrusion, elevated indoor humidity, and microbial growth; (b) failing to reasonably repair and remediate issues related to mold, moisture, and water intrusion, including the roof damage reported on October 12, 2024 that was not fully re-shingled until January 22, 2025; (c) failing to adequately respond to Plaintiffs' complaints regarding unsafe conditions in their home, including the January 26, 2025 report of an active leak and visible mold in the storage room, and the February 19, 2025 report of an active leak and mold-like odor in the master bathroom; (d) failing to implement appropriate safety protocols to protect residents from toxic mold; (e) repeatedly marking work orders "completed" when the underlying plumbing, leak, moisture, and mold conditions remained uncorrected; (f) leaving the family inside the residence for approximately seven days during the April 2025 water-damage repairs which were undertaken behind loose plastic sheeting instead of proper containment; (g) passing the residence through post-remediation verification on September 30, 2025 when the HVAC system had reportedly been inoperable for more than a week and interior temperatures had risen to approximately 96 degrees; (h) failing to disclose that a prior occupant of the residence had complained to Harbor Bay about mold or suspected mold; (i) representing that "no moisture was found" and that the residence was clean after limited visual inspections that did not reach the ductwork, HVAC intake

areas, or other concealed locations implicated by the November 6, 2025 independent testing; (j) use of untrained and/or unlicensed workers to repair and remediate Plaintiffs' home; (k) failure to hire and/or train competent employees to properly repair and remediate Plaintiffs' home; and (l) failure to exercise reasonable care to select, employ, instruct, and/or supervise competent and careful contractors to perform work in Plaintiffs' home involving a risk of physical harm unless skillfully and carefully performed and/or to perform any duty which the Defendants owed to third persons.

65. Defendants engaged in additional safety violations and breaches of the duty of care to be determined upon discovery.

66. Defendants knew or should have known that maintenance failures had compromised the safety of Plaintiffs' home.

67. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT III: Gross Negligence**
**(against all Defendants)**

68. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

69. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home at MacDill. Defendants' conduct fell grossly below the applicable standard of care. Moreover, Defendants were recklessly indifferent to the consequences of their acts and omissions and failed

to demonstrate even the slight diligence that a reasonable landlord or property manager would have exercised under the same or similar circumstances.

70. As the owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain Plaintiffs' home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

71. As property manager for Plaintiffs' home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

72. Defendants were aware that circumstances in Plaintiffs' home constituted an imminent or clear and present danger amounting to more than normal or usual peril, with tenants often complaining to Defendants of mold and illnesses.

73. Defendants' acts and omissions fell grossly below the standard of care owed to Plaintiffs, and exhibited a conscious disregard for the consequences of their behavior, in multiple respects, including: (a) failing to remediate defects that would cause moisture intrusion and microbial growth; (b) failing to reasonably repair and remediate the reported mold, moisture, and water intrusion; (c) failing to implement appropriate safety protocols to protect residents from toxic mold; (d) failing to adequately respond to the family's January 26, 2025 and February 19, 2025 reports of

active leaks, visible mold, and a mold-like odor; (e) failing to warn Plaintiffs that they were being exposed to toxic mold; (f) repeatedly marking work orders "completed" when the underlying conditions remained uncorrected; (g) leaving the family inside the residence for approximately seven days during the April 2025 water-damage repairs behind loose plastic sheeting instead of proper containment; (h) concealing that a prior occupant had complained to Harbor Bay about mold or suspected mold in the residence; (i) representing that the residence was clean and that "no moisture was found" after the November 6, 2025 independent testing high levels of Penicillium/Aspergillus-type spores within the HVAC supply plenum; (j) use of untrained and/or unlicensed workers to repair and remediate Plaintiffs' home; (k) failure to hire and/or train competent employees to properly repair and remediate Plaintiffs' home; and (l) failure to exercise reasonable care to select, employ, instruct, and/or supervise competent and careful contractors to perform work in Plaintiffs' home involving a risk of physical harm unless skillfully and carefully performed and/or to perform any duty which the Defendants owed to third persons; and (m) engaging in additional safety violations and breaches of the duty of care to be determined upon discovery. Each of the Defendants' reckless indifference to the rights of Plaintiffs is equivalent to an intentional violation of them.

74. As a direct and proximate result of Defendants' gross negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT IV: Omitted**

**COUNT V: Negligent Infliction of Emotional Distress**
**(against all Defendants)**

75. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

76. By their acts and omissions, Defendants caused Plaintiffs to be exposed to and come into direct physical contact with mold and mold-contaminated conditions within their home.

77. As a result of that physical contact and exposure, Plaintiffs suffered physical injury, including, but not limited to, respiratory illness, allergic reactions, skin conditions, and other bodily harm.

78. As a direct consequence of these physical injuries, Plaintiffs suffered severe emotional distress, including worry, anxiety, anguish, suffering, and grief. Plaintiffs suffered additional physical injuries as a result of the emotional distress.

79. Plaintiffs' claims for emotional distress arise directly from physical impacts caused by Defendants' conduct. Each Plaintiff sustained direct physical contact with toxic mold within the home, and the members of the family suffered resulting physical injuries, including such conditions as respiratory illness, allergic reactions, skin conditions, and other bodily harm documented in this Complaint. Plaintiffs' emotional distress arises from, and is accompanied by, physical manifestations and injuries.

80. Defendants knew or should have known that Plaintiffs' home was unsafe to reside in, and that exposure to and contact with mold would inevitably occur and

would result in physical harm to Plaintiffs.

81. As a direct result of Defendants' negligence and gross negligence, Plaintiffs came into physical contact with mold.

82. Plaintiffs suffered severe emotional distress as a result of that unhealthy and dangerous contact. Plaintiffs suffered physical injury as a result of the emotional distress.

83. Defendants are liable for the consequences that they knew or should have known would occur because of their negligent conduct.

84. Plaintiffs have suffered, are suffering, and will continue to suffer severe emotional distress and associated harms because of Defendants' acts and omissions.

**COUNT VI: Intentional Infliction of Emotional Distress**
**(against all Defendants)**

85. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

86. Defendants intentionally and knowingly subjected Plaintiffs to housing conditions that were unsafe and unhealthy.

87. Defendants also recklessly misled Plaintiffs into moving into a home that they knew was dangerous and unfit for human habitation. Defendants then deceived the Plaintiffs into remaining in that home by falsely claiming that they would eliminate those dangers. This intentional conduct, which subjected Plaintiffs to risk of serious injury or illness, was extreme and outrageous.

88. Intentionally subjecting the Plaintiffs to such dangerous conditions and taking actions to ensure their continued exposure, is beyond all possible bounds of

decency and intolerable in a civilized community.

89. This conduct caused severe emotional distress, as Plaintiffs suffered serious injuries and watched their loved ones get sick, and eventually understood that they were constantly in grave danger in their own home.

90. Plaintiffs suffered emotional and physical injury due to their severe emotional distress.

**COUNT VII: Breach of the Warranty of Habitability**
**(against Defendant AMC)**

91. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

92. AMC breached express and implied warranties of habitability.

93. AMC owed Plaintiffs a duty to provide them with habitable living conditions, under FLA. STAT. § 83.51, including but not limited to a duty to exercise reasonable care in the operation, inspection, management, and maintenance of Plaintiffs' home. AMC failed to meet the standard of care in performing those duties. Upon information and belief, in their lease, AMC warranted that the housing it provided was safe, habitable, and free from defects.

94. AMC failed to live up to its duty to inspect the Plaintiffs' home prior to their moving in, to make necessary repairs, or to transfer them to a reasonably safe home.

95. After Plaintiffs moved in, AMC did not reasonably maintain the home to meet the ordinary and normal standards of fitness. The presence of moisture and mold in Plaintiffs' home was a dangerous condition that AMC should have

remediated.

96. As a result of AMC's breach of the express and implied warranties of habitability, Plaintiffs suffered substantial physical injuries and damage as well as harm to their personal property and other financial harm. Plaintiffs also suffered severe mental and emotional distress related to contact with toxic mold. Plaintiffs suffered special damages and will require ongoing testing/medical monitoring.

**COUNT VIII: Third-Party Beneficiary Contract**
**(against all Defendants)**

97. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

98. Defendants are bound by their contracts with the Air Force respecting MHPI housing at MacDill. Each of those contracts was entered into to further the goal of the MHPI to improve housing for service members.

99. The Operating Agreement originally entered into by AMC East, LLC and the Air Force creating AMC contains language establishing that Plaintiffs were intended beneficiaries of Defendants' contractual obligations with respect to the provision of housing at MacDill. On information and belief, the current version of any Operating Agreement under which AMC presently operates continues to contain such or similar language.

100. On information and belief, the Ground Lease, entered into by the Air Force and AMC, also contains language indicating that Plaintiffs were intended beneficiaries.

101. On information and belief, property management agreements governing

Defendants' property management practices at MacDill also contain provisions indicating that Plaintiffs were intended beneficiaries of those agreements.

102. Defendants and the Air Force intended to benefit the service members living at MacDill. Maj. Scire is a servicemember living at MacDill with his family. The obligations to provide these intended benefits were included in the underlying contracts to ensure military service members, including Plaintiffs, would be provided with safe and habitable housing.

103. Defendants breached the requirements of the underlying contracts by failing to provide suitable management, maintenance, operations, and renovations of Plaintiffs' home.

104. Defendants also breached the duty of good faith and fair dealing implied in the contracts.

105. As a foreseeable result of the Defendants' breaches of the contracts, Plaintiffs, who are intended, direct, third-party beneficiaries of such contracts, sustained damages.

**COUNT IX: Negligence Per Se**
**(against all Defendants)**

106. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

107. Defendants owed Plaintiffs a duty to take steps to protect them from the specific injuries outlined in this Complaint.

108. This duty was created by statutes specifically intended to protect Plaintiffs from those harms.

109. For example, "with respect to test results relating to the health and safety condition of a housing unit, the landlord providing the housing unit shall– (A) not later than three days after receiving the test results, share the results with the tenant of the housing unit and submit the results to the head of the installation housing management office; and (B) include with any environmental hazard test results a simple guide explaining those results, preferably citing standards set forth by the Federal Government relating to environmental hazards." 10 U.S.C. § 2891a(d)(2).

110. Additionally, section 19-231 of Tampa's Code of Ordinances states that, "No person shall occupy or let to another for occupancy or offer to let to another for occupancy any dwelling or dwelling unit which does not comply with the following standard." It then outlines a list of specific requirements intended to protect residents' health and safety. Defendants failed to comply with these requirements, including:

a) "*General condition of rental unit.* Each dwelling unit let or offered to let shall be clean, sanitary, fit for human habitation and in a good state of repair." Tampa Code of Ordinances § 19-231(17);

b) "Every floor, wall and ceiling shall be capable of affording privacy and shall be maintained in a good state of repair." *Id.* §19-231(10);

c) "*Plumbing fixtures and pipes.* Every plumbing fixture and water and waste pipe shall be maintained in good working condition, free from defects, leaks and obstructions." *Id.* § 19-231(13);

d) "*Kitchen and bathroom floors.* Floors in kitchens and bathrooms, except where constructed of materials impervious to moisture, shall be covered

with asphalt, vinyl-plastic, rubber tile, ceramic tile, terrazzo or linoleum or other durable, waterproof, nonabsorptive material." *Id.* § 19-231(14)(a);

e) "*Flooring generally.* All other flooring throughout the dwelling shall be of approved grade and type of material properly installed." *Id.* § 19-231(14)(b).

111. Defendants also failed to comply with § 19-232, which provides that, "The owner shall be responsible for the repair and replacement of all plumbing facilities and equipment." *Id.* § 19-232(7).

112. Defendants also failed to comply with § 19-47, which provides that, "Nothing shall be allowable on the premises within the corporate limits of the city provided for in this chapter that shall in any way be offensive or noxious by reason of the emission of odors, gases, dust, smoke, light, vibration or noise … nor shall anything be constructed or maintained that would in any way constitute an eyesore or nuisance to adjacent property owners or residents or to the community." *Id.* § 19-47.

113. Plaintiffs are members of the class that each of the above statutes were designed to protect.

114. The statutes were intended to protect residents from the sorts of exposure-based injuries suffered by Plaintiffs and described in this Complaint.

115. Additionally, Florida Statutes § 386.03, § 386.051, and § 386.041 make it unlawful to maintain a sanitary nuisance as defined in Florida Statute § 386.01 and any other applicable statutes, codes, and regulations governing the habitability of

residential housing and the health and safety of occupants.

116. The violations of these statutes constitute negligence per se and were the proximate cause of Plaintiffs' injuries.

**COUNT X: Medical Monitoring**
**(against all Defendants)**

117. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

118. Plaintiffs suffered physical injuries when they were exposed to hazardous mold, as described in this Complaint.

119. As a result of their prolonged exposure to moisture-damaged indoor environments and associated microbial contamination at 8538 Tampa Point Boulevard, the Scire family faces an increased and individualized risk of developing chronic and latent health conditions.

120. Maj. Scire developed progressive neurological, respiratory, sinus, and infectious conditions during the period of exposure, including numbness and tingling of his extremities, headaches, severe fatigue, sleep-related breathing problems, a perforated eardrum, recurrent ear infections, mastoiditis, sepsis requiring hospitalization, and a right maxillary sinus retention cyst, and requires ongoing medical evaluation and monitoring.

121. Ms. Scire developed significant memory impairment, chronic sinus congestion, headaches, respiratory irritation, and fatigue during the period of exposure, and requires ongoing medical evaluation and monitoring.

122. The Scire family's minor son, R.S., requires ongoing evaluation and

monitoring. R.S. developed rashes, allergic and respiratory symptoms, sleep-disordered breathing, and airway problems during the period of exposure. He required a sleep study, ENT evaluation, and referral for adenoidectomy. As a minor child whose immune and respiratory systems are still developing, R.S. faces heightened long-term vulnerability from mold exposure, making early and ongoing monitoring critical.

123. The November 6, 2025 independent mold sampling—documenting approximately 910,000 and 750,000 Penicillium/Aspergillus-type spores per cubic meter within the HVAC supply plenum and Chaetomium and Penicillium/Aspergillus-type contamination on subflooring surfaces—together with IDE's August 2025 findings of suspected growth within the air handler and supply plenum and the residence's recurring water intrusion, corroborates the Scire family's exposures and informs the monitoring reasonably necessary for each Plaintiff according to contemporary scientific principles.

124. The monitoring protocols required will differ for each Plaintiff based on their individual presentations, but each member of the Scire family would benefit from regular evaluation.

125. The monitoring procedure would be unnecessary in the absence of Plaintiffs' exposure.

126. Given the exposure, monitoring regimes are reasonably necessary according to contemporary scientific principles.

127. Plaintiffs are entitled to the cost of medical monitoring necessary to detect the onset or worsening of physical harm and/or, in the alternative, that the court

use its equitable powers to create and supervise a medical monitoring fund.

**COUNT XI: Unjust Enrichment**
**(against Defendant AMC)**

128. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

129. Plaintiffs conferred a benefit on AMC in the form of the BAH rent that the military transferred on their behalf. These funds belonged to Plaintiffs and were paid to AMC in return for safe and habitable housing at MacDill Air Force Base.

130. AMC failed to provide Plaintiffs with a safe and habitable home, and it failed to timely and adequately remediate the recurring water intrusion, moisture, and mold conditions, which persisted from within one month of the family's September 2024 move-in through at least August 2026 and which required the family to be displaced from the residence from September 15 through October 15, 2025. It would be inequitable and unjust for AMC to retain the BAH funds provided by Plaintiffs.

131. Plaintiffs are entitled to restitution of some or all of the BAH funds paid to AMC.

**COUNT XII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Unfair Conduct)**
**(against all Defendants)**

132. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

133. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

134. At all relevant times, Defendants solicited, advertised, offered, and/or

provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA. FLA. STAT. § 501.203.

135. At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA. *Id.*

136. Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted unfair and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

137. On information and belief, Defendants failed to follow their own policies and procedures relating to the treatment of harmful conditions, including policies and procedures for the treatment and remediation of mold.

138. Defendants' acts and practices exposed Plaintiffs to unsafe and unhealthy conditions, including toxic mold, structural defects, water leaks, and HVAC issues. These abhorrent conditions were known to Defendants.

139. Given those unconscionable conditions, Plaintiffs' interests in their MacDill home were only worth a small fraction of the rental payments for that home.

140. Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. As such, those acts and practices were unfair and unconscionable within the meaning of the FDUTPA and thus violated the FDUTPA.

141. As a result of Defendants' unfair and unconscionable acts or practices,

Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT. § 501.211.

**COUNT XIII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Deceptive Conduct) (against all Defendants)**

142. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

143. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful deceptive acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

144. At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, see *id., e.g.*, § 501.203.

145. At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA, *see id.*

146. Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted false, misleading, and/or deceptive acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

147. On information and belief, AMC, as signatory to the lease, and all Defendants, through Harbor Bay's direct and ongoing communication with Plaintiffs, engaged in deceptive acts and practices, including the following:

(a) Defendants concealed facts and made deceptive assurances that

caused Plaintiffs to sign a lease that they never would have signed had they known the truth;

(b) Defendants made false, misleading, and/or deceptive representations that Plaintiffs' MacDill home was in habitable condition and thus far more valuable than it was in reality;

(c) on information and belief, in the lease between Defendants and Plaintiffs, Defendants falsely warranted that Plaintiffs' housing was safe, habitable, and free from defects;

(d) Defendants failed to disclose information that they knew about the condition of Plaintiffs' housing with the intention of inducing Plaintiffs into leasing the home at a cost beyond what it was actually worth;

(e) Defendants represented, through Harbor Bay maintenance and remediation personnel, that repairs and remediation had been completed and that "no moisture was found" in the residence, to induce the family to return from displacement and remain in the residence.

148. As a few examples, Defendants (a) marked the December 4, 2024 plumbing work order "completed" when the technician had been unable to correct the conditions, and marked the January 26, 2025 leak-and-mold work order complete while the mold and affected drywall remained unaddressed; (b) represented, through the September 30, 2025 post-remediation verification, that the residence had passed remediation when the residence's HVAC system had reportedly been inoperable for more than a week and interior temperatures had risen to approximately 96 degrees, inducing

the family to return from displacement on October 15, 2025; (c) advised Maj. Scire on February 23, 2026 that "no moisture was found" and that everything was clean, following limited visual inspections by employees identified as Ivan and Julio that did not reach the ductwork, HVAC intake areas, or other concealed locations implicated by the November 6, 2025 independent testing; and (d) reported the master-bathroom ceiling and roof or vent work complete by approximately August 19, 2026, when rainwater was dripping through the bathroom ceiling exhaust fan four days later and Harbor Bay technician David's moisture meter confirmed moisture remaining within the ceiling drywall on August 24, 2026.

149. Plaintiffs paid far more in rent than their home was actually worth.

150. Due to their role in the leasing and/or management and maintenance of the Plaintiffs' home at MacDill, Defendants were uniquely aware of the condition of Plaintiffs' home, maintenance history, defects in design, the need for repairs, remodeling, and remediation, and the existence of mold and other hazardous conditions.

151. As a result of Defendants' false, misleading, and deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. *Id.* § 501.211.

**COUNT XIV: Negligent Misrepresentation Concerning Condition of the Home**
**(against all Defendants)**

152. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

153. Defendants either knew that Plaintiffs' home was unsafe and unfit for human habitation, made representations concerning the safety and habitability of the

home without knowledge of their truth or falsity, or should have known that such representations were false.

154. Defendants intended to convince Plaintiffs to sign a lease and move into their home based on these representations.

155. Defendants concealed the residence's history of water intrusion and the prior occupant's complaints to Harbor Bay about mold or suspected mold within the residence, and other hazardous conditions—none of which was disclosed to the family before it accepted and occupied the residence.

156. On information and belief, the lease likewise represented that the home was in safe, clean, and habitable condition and free of mold, mildew, and signs of water intrusion. Those representations were false, and Defendants failed to disclose the residence's history of water intrusion or the prior occupant's complaints of mold within the residence.

157. Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions to move into their home.

158. Plaintiffs justifiably relied on Defendants' assurances that their home was safe, mold free, and fit for human habitation at the time that they moved in.

159. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT XV: Negligent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

160. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

161. Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants, including via Harbor Bay, downplayed the severity of those problems in order to convince Plaintiffs to remain in their home.

162. Defendants falsely represented that hazardous and unsafe conditions, including mold and elevated indoor moisture, were innocuous or easily fixed conditions. Defendants knew or should have known that this was untrue.

163. Defendants falsely told Plaintiffs that there was no mold in their home, when they knew or should have known that there was mold.

164. When Plaintiffs requested that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take appropriate steps to mitigate or fix those problems. Defendants either knew that they could never take those steps, made the representations without knowledge of their truth or falsity, or should have known the representations were false.

165. Defendants intended to convince Plaintiffs to remain in their home or agree to continue their occupancy based on these false representations.

166. As a few examples, Defendants falsely (a) marked the December 4, 2024 plumbing work order "completed" when the technician had been unable to correct the conditions, and marked the January 26, 2025 leak-and-mold work order complete while the mold and affected drywall remained unaddressed; (b) represented, through

the September 30, 2025 post-remediation verification, that the residence had passed remediation when the residence's HVAC system had reportedly been inoperable for more than a week and interior temperatures had risen to approximately 96 degrees, inducing the family to return from displacement on October 15, 2025; (c) advised Maj. Scire on February 23, 2026 that "no moisture was found" and that everything was clean, following limited visual inspections by employees identified as Ivan and Julio that did not reach the ductwork, HVAC intake areas, or other concealed locations implicated by the November 6, 2025 independent testing; and (d) reported the master-bathroom ceiling and roof or vent work complete by approximately August 19, 2026, when rainwater was dripping through the bathroom ceiling exhaust fan four days later and Harbor Bay technician David's moisture meter confirmed moisture remaining within the ceiling drywall on August 24, 2026.

167. Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions whether to remain in their home.

168. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

169. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial damages, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVI: Fraudulent Inducement**
**(against all Defendants)**

170. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

171. Defendants deliberately, willfully, and knowingly made false and material statements regarding the habitability and safety of Plaintiffs' housing as described in detail in this Complaint in order to induce Plaintiffs to sign a lease and move into their home.

172. Those representations were false when made, and Defendants knew or should have known they were false, given the prior occupant's complaints to Harbor Bay about mold or suspected mold within the residence, which Defendants did not disclose to the Scire family before it signed the lease.

173. Defendants concealed the residence's history of water intrusion and the prior occupant's complaints to Harbor Bay about mold or suspected mold within the residence, and other hazardous conditions—none of which was disclosed to the family before it accepted and occupied the residence.

174. On information and belief, the lease likewise represented that the home was in safe, clean, and habitable condition and free of mold, mildew, and signs of water intrusion. Those representations were false, and Defendants failed to disclose the residence's history of water intrusion or the prior occupant's complaints of mold within the residence.

175. Defendants provided Plaintiffs no disclosure of the residence's unresolved history of hazardous conditions, including the prior occupant's complaints of

mold or suspected mold within the home.

176. These representations were material to Plaintiffs' decisions to enter into their lease causing Plaintiffs' BAH to be paid to Defendants.

177. Plaintiffs relied on Defendants' assurances that their home was safe and fit for human habitation at the time that they moved in.

178. Defendants knew or reasonably should have known that these statements, including the representations in the lease, were false. But for the Defendants' false statements, Plaintiffs would not have signed the lease for their MacDill home.

179. As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require ongoing medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVII: Fraudulent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

180. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

181. Defendants, including via Harbor Bay, deliberately and willfully made false and material statements regarding the habitability and safety of the Plaintiffs' housing, in order to cause Plaintiffs to remain in their home notwithstanding the unsanitary and dangerous conditions in it.

182. Defendants made false statements to Plaintiffs that their home was suitable for habitation throughout the course of Plaintiffs' residence in the home.

183. Once Plaintiffs discovered the unsafe and hazardous conditions in their

home, Defendants consistently, deliberately, and falsely downplayed the severity of those problems. Defendants knew the true severity of those conditions, having themselves inspected and performed repair work at the home.

184. When Plaintiffs persisted in demanding that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take steps to mitigate or fix those problems.

185. On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when Defendants knew, from their own technicians' prior visits to the home, that they had not adequately done so.

186. As a few examples, Defendants falsely (a) marked the December 4, 2024 plumbing work order "completed" when the technician had been unable to correct the conditions, and marked the January 26, 2025 leak-and-mold work order complete while the mold and affected drywall remained unaddressed; (b) represented, through the September 30, 2025 post-remediation verification, that the residence had passed remediation when the residence's HVAC system had reportedly been inoperable for more than a week and interior temperatures had risen to approximately 96 degrees, inducing the family to return from displacement on October 15, 2025; (c) advised Maj. Scire on February 23, 2026 that "no moisture was found" and that everything was clean, following limited visual inspections by employees identified as Ivan and Julio that did not reach the ductwork, HVAC intake areas, or other concealed locations implicated by the November 6, 2025 independent testing; and (d) reported the master-bathroom ceiling and roof or vent work complete by approximately August 19, 2026,

when rainwater was dripping through the bathroom ceiling exhaust fan four days later and Harbor Bay technician David's moisture meter confirmed moisture remaining within the ceiling drywall on August 24, 2026.

187. Defendants knew that the statements concerning the condition and maintenance of the home and the promised remediation were false.

188. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

189. These representations were material to Plaintiffs' decisions to remain in their home.

190. But for Defendants' false statements, Plaintiffs would not have remained in their MacDill home.

191. As a direct and proximate result of Defendants' fraudulent misrepresentation, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVIII: Fraudulent Concealment of Condition of Housing (against all Defendants)**

192. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

193. Defendants deliberately, willfully, and actively concealed material facts regarding the habitability and safety of Plaintiffs' housing in order to cause Plaintiffs to accept and occupy the residence.

194. Defendants concealed the residence's history of water intrusion and the

prior occupant's complaints to Harbor Bay about mold or suspected mold within the residence, and other hazardous conditions—none of which was disclosed to the family before it accepted and occupied the residence.

195. Upon information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of any water intrusion. Defendants either knew or should have known that this would conceal the true conditions at the home.

196. Defendants had knowledge of the defects and prior repairs in the home, or were in a superior position to discover them, and therefore had a duty to disclose those material facts to Plaintiffs, and failed to do so.

197. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of hazardous and unsafe conditions in their home.

198. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

199. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to sign a lease and move into their home and should have been disclosed.

200. Defendants knew that their concealments would induce Plaintiffs to act.

201. Plaintiffs relied on Defendants' concealments and omissions.

202. But for the Defendants' fraudulent concealments and material omissions,

Plaintiffs would not have signed the lease for their MacDill home.

203. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XIX: Fraudulent Concealment Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

204. Plaintiffs incorporate the allegations set forth in paragraphs 1–53.

205. Defendants, including through Harbor Bay, deliberately, willfully, and actively concealed material facts regarding the habitability and safety of Plaintiffs' housing in order to cause Plaintiffs to remain in their MacDill home.

206. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of continuing hazardous and unsafe conditions in their home.

207. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

208. As a few examples, Defendants falsely (a) marked the December 4, 2024 plumbing work order "completed" when the technician had been unable to correct the conditions, and marked the January 26, 2025 leak-and-mold work order complete while the mold and affected drywall remained unaddressed; (b) represented, through the September 30, 2025 post-remediation verification, that the residence had passed

remediation when the residence's HVAC system had reportedly been inoperable for more than a week and interior temperatures had risen to approximately 96 degrees, inducing the family to return from displacement on October 15, 2025; (c) advised Maj. Scire on February 23, 2026 that "no moisture was found" and that everything was clean, following limited visual inspections by employees identified as Ivan and Julio that did not reach the ductwork, HVAC intake areas, or other concealed locations implicated by the November 6, 2025 independent testing; and (d) reported the master-bathroom ceiling and roof or vent work complete by approximately August 19, 2026, when rainwater was dripping through the bathroom ceiling exhaust fan four days later and Harbor Bay technician David's moisture meter confirmed moisture remaining within the ceiling drywall on August 24, 2026.

209. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to remain in their home and should have been disclosed.

210. Defendants knew that their concealment or omission would induce the Plaintiffs to act or refrain from acting.

211. Plaintiffs relied on Defendants' concealments and omissions.

212. But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have remained in their MacDill home.

213. As a direct and proximate result of Defendants' fraudulent concealment, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well

as mental and emotional distress related to those physical injuries.

## DAMAGES

As a result of the Defendants' breaches, negligence, gross negligence, fraud, and other acts and omissions described in this Complaint, Plaintiffs have sustained damages and injuries and are entitled to recover damages related to the following, including but not limited to:

a. Past and future physical pain and suffering;

b. Past and future mental anguish and emotional distress;

c. Past and future medical, healthcare, and attendant care expenses;

d. Past and future lost income and earning capacity;

e. Past and future physical impairment;

f. Past and future loss of enjoyment and quality of life;

g. Past and future loss of enjoyment of property;

h. Increased risk of future harm and medical monitoring for life;

i. Loss of life expectancy;

j. Nuisance damages, including inconvenience, illness, and fear;

k. Out-of-pocket expenses;

l. Loss of and/or damage to personal property;

m. Costs, expenses, and fees, including attorneys' fees; and

n. Punitive damages.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

A. Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B. Award punitive damages as appropriate, including for counts III, V, VI, VII, IX, XIV, XV, XVI, XVII, XVIII, XIX, in an amount to be determined at trial;

C. Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees, including attorneys' fees, to which they may be entitled by law, and;

D. Grant the Plaintiffs such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

DATED: September 15, 2026. Respectfully submitted,

*/s/ Robert J. McKee*
Robert J. McKee
Florida Bar No.: 972614
**THE MCKEE LAW GROUP, LLC**
2800 South Flamingo Road
Davie, Florida 33330
Tel: (954) 888-9877
Fax: (954) 217-0150
Email: rmckee@themckeelawgroup.com
Lead Counsel

Vincent J. Colatriano*
Michael Weitzner*
**COOPER & KIRK, PLLC**
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: 202-220-9600
Fax: 202-220-9601
Email: vcolatriano@cooperkirk.com
Email: mweitzner@cooperkirk.com

Kristina Baehr*
**JUST WELL LAW, PLLC**
1809 Pearl Street
Austin, Texas 78701
Tel: (512) 693-8029
Email: Kristina@well.law
Email: Militaryhousinglit_PLslistserv@well.law

**Pro Hac Vice forthcoming*
*Attorneys for Plaintiffs*